UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y

★ JUN 29 2016

BROOKLYN OFFICE

-----------------------------------------------------------------X

ANNIE M. CHEUNG,

       Plaintiff,

   - against -

PATRICK R. DONAHOE, POSTMASTER
GENERAL,

       Defendant.

-----------------------------------------------------------------X

MEMORANDUM & ORDER
11-cv-0122 (ENV) (RLM)

VITALIANO, D.J.

  On January 7, 2011, plaintiff Annie M. Cheung, an employee at the United States Postal Service ("USPS") Processing and Distribution Center in Flushing, Queens, brought this action against John E. Potter, then Postmaster General,[1] seeking injunctive and declaratory relief, back pay, front pay, compensatory damages, attorney's fees, costs and other relief as redress for (i) failure to provide reasonable accommodation under the Rehabilitation Act of 1973; (ii) employment discrimination and retaliation on the basis of disability under the same statute; and (iii) employment discrimination and retaliation on the basis of race and gender under Title VII of the Civil Rights Act.[2] Defendant now moves for summary judgment, and Cheung cross-moves for partial summary judgment solely for the purpose of establishing that she is disabled as a matter of law. For the reasons that follow, defendant's motion for summary judgment is granted and the cross motion of plaintiff is denied.

---

[1]   On March 29, 2013, the Court granted defendant's motion, pursuant to Fed. R. Civ. P. 25(d), to replace Potter as the named defendant in this case with his successor and current Postmaster General of the United States, Patrick R. Donahoe.

[2]   Cheung also brought claims of employment discrimination on the basis of age under the Age Discrimination in Employment Act of 1967, but dismissed those claims, with prejudice, pursuant to a stipulation so-ordered by the Court on July 26, 2013. See Dkt. No. 31.



<u>Background</u>

In 1987, Cheung, a woman of Chinese descent, began working for USPS at a processing and distribution center in Flushing, Queens. Compl., Dkt. No. 1, ¶¶ 12-13.[3] Cheung claims that, since the time of her hiring, she has suffered from psoriasis, which, she contends, constitutes a disability within the definitional terms of ADA. Compl. ¶¶ 14-15. She acknowledges, however, that her condition has never caused her to be hospitalized or prevented her from undertaking everyday physical activities such as shoveling snow, raking leaves, mopping floors, washing dishes and doing laundry. Def. Rule 56.1 Stmt., Dkt. No. 39-2, ¶¶ 22-25. Moreover, Cheung did not inform USPS of her condition when she was hired. <u>Id.</u> ¶ 14. Quite to the contrary, on her Medical Examination and Assessment form, she indicated that she did not have "any medical disorder or physical impairment which could interfere in any way with the full performance of [the] duties" for which she had applied. <u>Id.</u> A pre-employment medical assessment also failed to uncover her then-existing condition. <u>Id.</u> ¶ 15.

In keeping with this silence, for the first 15 years of her employment, Cheung did not make any complaints, nor file any documents or otherwise advise USPS management of any issues relating to her psoriasis. <u>Id.</u> ¶ 16. Nevertheless, her psoriasis did, she claims, occasionally cause her to miss work. <u>Id.</u> ¶ 27. She sought to excuse these absences by submitting notes from Dr. Kiyoon Yoon, who wrote that Cheung missed work because of an "[a]utoimmune disorder" and "upper respiratory disease." <u>Id.</u> ¶¶ 30-36. Dr. Yoon, however, is not a dermatologist and did not specifically refer to psoriasis as one of Cheung's ailments, though in certain of his notes he did list "generalized skin rashes" as a symptom of her condition. <u>Id.</u> ¶¶ 28-38.

---

[3] The facts are drawn from the complaint, depositions, exhibits, Rule 56.1 Statements and affidavits submitted by the parties. All reasonable inferences are drawn in favor of the non-moving party. <u>See</u> Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004).

Cheung's tenure with USPS appears to have proceeded uneventfully until 2009, when, like many people, she found herself grappling with the aftermath of the global financial crisis. USPS was not spared the effects of the Great Recession: the Queens processing center where Cheung worked lost approximately 20% of its letter mail volume during this time. Id. ¶¶ 114-16, 128. Even worse, contemporary projections suggested further declines on the horizon. Id. ¶ 117. Accordingly, in March 2009, USPS announced that it intended to undertake significant cost-cutting measures, including eliminating manual positions that could be cheaply and efficiently replaced with automation. Id. ¶¶ 118, 123.

That decision proved unfortunate for Cheung. During her lengthy tenure at USPS, she had worked many "bids," the technical term for positions assigned to USPS employees based on their voluntary requests. Id. ¶¶ 7-10, 83-84. From 2002 through early 2009, Cheung was assigned to a "manual letter uncoded scheme" bid, in which role she manually sorted mail that was missing zip codes. Id. ¶¶ 11, 148-49. Such positions, of course, were the exact kind targeted by USPS's mechanization measures. In March 2009, Cheung was informed that her position as a manual mail processing clerk would be eliminated. Id. ¶ 156. The same was true for the two other employees who held manual letter uncoded scheme bids, a Caucasian male and an African-American male. Id. ¶¶ 161-64.[4] And they were hardly alone: at least 77 other employees at the Queens location also had their bids eliminated, including 38 males and 39 females. Id. ¶¶ 172-73. Notably, though, at least one female employee and one Asian employee did not have their bids eliminated. Id. ¶¶ 180-81.[5]

---

[4]     There is no substantial dispute that manual letter bids survived the 2009 crisis, and that the surviving bids were awarded to employees with greater seniority than Cheung. Id. ¶¶ 190-93.

[5]     Following the elimination of her bid, Cheung filed her first informal complaint with USPS's internal equal employment opportunity ("EEO") department, claiming discrimination

3

The sparks between Cheung and USPS continued to fly. Although her bid was eliminated, she was not fired; rather, she was deemed "unassigned" and was free to seek a new bid. Id. ¶ 170. So, in or about May 2009, Cheung voluntarily bid for, and was awarded, a position as a mail processing clerk within the automation area – a bid that would require her to use an automated mail sorting machine. Id. ¶¶ 282-284. The pairing was far from harmonious: Cheung claims that her psoriasis required her to wear leather or cotton gloves while working, see Compl. ¶¶ 14-17, 20, but USPS policy strictly forbid employees from wearing leather, cloth or cotton gloves while operating these machines. Id. ¶¶ 214-17, 220-23. Ironically, Cheung was familiar with this policy at the time she submitted her bid, having learned of it both through training she had received, id. ¶¶ 231-32, and from her work as a union "shop steward," in which she had represented several USPS clerks who were denied permission to wear leather and cotton gloves while operating these machines. Id. ¶ 218. Plaintiff claims, notwithstanding, that she believed she could disregard this policy because, on the few previous occasions that she had operated these machines, she had worn leather gloves without incident. Id. ¶¶ 230, 233. In any event, she acknowledges that she had never received explicit permission to wear her gloves while using these machines. Id. ¶¶ 236. Additionally, the one time a supervisor had questioned her about her glove use, she did not inform the supervisor of her psoriasis, nor did she provide a doctor's note, as the supervisor requested. Id. ¶¶ 248, 254-55.[6]

---

based on, among other things, race, sex and disability. Id. ¶¶ 195-96. Specifically, Cheung alleged that USPS should have taken her disability into consideration before terminating her bid. Id. ¶ 200. On May 21, 2009, USPS told plaintiff that its internal inquiry had found that "[a]ll the uncoded bids were abolished based on the low volume of uncoded mail," and that these terminations had all been made in accordance with USPS policy. Id. ¶ 201. After receiving this notice, plaintiff filed a formal EEO complaint, adding a claim of retaliation for past grievances she had filed with her union. Id. ¶ 202.

[6]     Subsequently, Cheung submitted a note to a different supervisor from Dr. Sanjay Lodha, who, like Dr. Yoon, was not a dermatologist. Id. ¶ 263. The note stated that Cheung "has

Predictably, soon after assuming her new bid, plaintiff was told that, in accordance with USPS policy, she could not wear her leather gloves while working on the automated sorting machines. Id. ¶ 290. She was further advised that, pursuant to the same policy, she could wear nitrile gloves instead. Id. ¶ 293. Cheung summarily refused. Although she had never worn nitrile gloves while working or been advised by any doctor to avoid wearing them, id. ¶¶ 296-307, she claimed that "common sense" informed her that nitrile gloves would cause her body temperature to rise, thus aggravating her psoriasis. Id. ¶¶ 294, 306. At an impasse, plaintiff was removed from her bid. Id. ¶ 330.

Plaintiff claims she was then given two options: await reassignment on "light duty," i.e., a transitional workday often comprising less than eight hours, or be sent for a "fitness for duty" examination to determine which bids would be suitable for her. Id. ¶ 331.[7] Cheung refused light duty, instead demanding that she either be allowed to work on the automated sorting machine with her own gloves or be assigned a manual task. Id. ¶ 343. She was, apparently, unmoved by the knowledge that her refusal to go on light duty precluded her from training for certain positions that would have allowed her to wear her gloves. Id. ¶¶ 456-59.[8] She also refused the

---

significant psoriasis . . . and therefore *requests* that she be allowed to wear leather [or] cotton gloves" while operating the automatic sorting machine. Id. ¶ 266 (emphasis added).

[7]     A "fitness for duty" examination is a medical examination used to assess whether or not a USPS employee is medically capable of meeting the requirements of his or her job. Id. ¶ 346. Such examinations may be properly used to resolve "disability related inquiries" or to substantiate a claimed condition or behavior if an employee fails to submit sufficient documentation for that condition. See id. ¶¶ 348, 351. Plaintiff acknowledges that other employees at the Queens facility had been sent for fitness for duty exams, including at least one white male employee. See id. ¶¶ 373-75.

[8]     On March 4, 2010, plaintiff filed yet another EEO complaint, charging that USPS management had denied her the right to complete this training. Id. ¶ 478. A formal complaint followed, on March 17, 2010. Id. ¶ 479. EEO issued a final agency decision on this second charge, finding that there was no discrimination or retaliation. Compl. ¶ 11.

fitness for duty examination, id. ¶¶ 354-56, opting for USPS to consult Dr. Lodha, id. ¶ 389. Dr. Lodha, however, refused to write a note excusing her from work on the automatic sorting machine. In fact, he advised her to consult a dermatologist. Id. ¶¶ 387-88; Rudy Letter, Dkt. No. 44-12. Nor did plaintiff provide any additional medical documentation. Id. ¶¶ 408-10, 413. At loggerheads with USPS, Cheung finally agreed to be put on enforced leave until she either applied for light duty or submitted to a fitness for duty examination. Id. ¶¶ 363-64.[9] Thereafter, she remained absent, but neither option open to her was pursued. Id. ¶¶ 404-414.

Finally, wishing to put an end to this stalemate, on March 11, 2010, USPS informed plaintiff that, unless she provided documentation explaining the reasons she had been absent from work and the probable date of her return, she would be placed on AWOL status. Id. ¶¶ 480-81. Cheung refused to provide this information, id. ¶ 482, and, as a result, was placed on AWOL status. Id. ¶ 483, 486.[10] Negotiations followed, and USPS and plaintiff agreed to an arrangement whereby Cheung could train for a position that would allow her to wear her gloves. Id. ¶ 514. Cheung assumed this position in April 2011, and still held it as of the time defendant filed the instant motion. Id. ¶¶ 516-17.

## Standard of Review

A district court must grant summary judgment if "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed.

---

[9]     Interestingly, on July 16, 2009, plaintiff also filed an informal EEO complaint, alleging discrimination based on her "physical disability – auto-immune" and claiming that USPS had not only failed to accommodate her but threatened her with the "fitness for duty" examination. See id. ¶ 376.

[10]     Plaintiff's placement on AWOL status led to yet another EEO complaint, alleging retaliation and disability discrimination. Id. ¶ 487.

2d 265 (1986). A motion court's responsibility in assessing the merits of a summary judgment motion is not to try issues of fact, but, rather, to "determine whether there *are* issues of fact to be tried." Sutera v. Schering Corp., 73 F.3d 13, 16 (2d Cir. 1995) (quoting Katz v. Goodyear Tire & Rubber Co., 737 F.2d 238, 244 (2d Cir. 1984)) (emphasis in original). The moving party bears the burden of demonstrating that there is no genuine issue as to any material fact, see Jeffreys v. City of N.Y., 426 F.3d 549, 553 (2d Cir. 2005). All ambiguities will be resolved and all permissible factual inferences will be drawn in favor of the party opposing the motion. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 83 (2d Cir. 2004); Gummo v. Vill. of Depew, 75 F.3d 98, 107 (2d Cir. 1996) ("If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.").

If the moving party meets its initial burden of demonstrating the absence of a disputed issue of material fact, the burden shifts to the nonmoving party. See Fed. R. Civ. P. 56(e). The nonmoving party may not rely solely on "conclusory allegations or unsubstantiated speculation" in order to defeat a motion for summary judgment. Scotto v. Almenas, 143 F.3d 105, 114 (2d Cir. 1998). At that point, the nonmoving party must "make a showing sufficient to establish the existence of [each] essential element to that party's case . . . since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 322-23. If the evidence favoring the nonmoving party is "merely colorable, or is not significantly probative, summary judgment may be granted." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-50, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986) (internal citations omitted).

At the same time, the Second Circuit has cautioned that courts should be "especially chary in handing out summary judgment in discrimination cases," where intent of the employer is usually a central factual issue. Jamilik v. Yale Univ., 362 F. App'x 148, 149 (2d Cir. 2009) (quoting Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 87 (2d Cir. 1996); see Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). "Moreover, as discrimination will seldom manifest itself overtly, courts must be alert to the fact that employers are rarely so cooperative as to include a notation in the personnel file that the firing is for a reason expressly forbidden by law." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999) (internal quotation marks omitted). Nevertheless, it is "beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases." Abdu-Brisson v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). Still, "a plaintiff must provide more than conclusory allegations of discrimination to defeat" a summary judgment motion. Schwapp, 118 F.3d at 110; see Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 40 (2d Cir. 1994).

Discussion

I.      Disability Discrimination

A federal employee's "sole claim for discrimination on the basis of disability is under the Rehabilitation Act[.]" Rivera v. Heyman, 157 F.3d 101, 103 (2d Cir. 1998); see Young v. U.S. Dep't of Homeland Sec., No. 10-CV-9571 (RJ S), 2011 WL 6057849, at *1 (S.D.N.Y. Dec. 5, 2011) (the Rehabilitation Act, not the ADA, establishes a cause of action for federal employees claiming disability discrimination). The Rehabilitation Act bars federal agencies from discrimination on the basis of an individual's disability, providing, in relevant part, as follows:

> [n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability . . . be subjected to discrimination under any program or activity receiving Federal

8

financial assistance or under any program or activity conducted by
any Executive Agency.

29 U.S.C. § 794(a). Although its terms are broadly drawn, the Rehabilitation Act incorporates

the standards of the Americans with Disabilities Act, 42 U.S.C. § 12111 et seq. and 42 U.S.C. §§

1220 1-04 and 12210 ("ADA"), see 29 U.S.C. § 794(d); see also Rodriguez v. City of New York,

197 F.3d 611, 618 (2d Cir. 1999), with one significant distinction: unlike the ADA, the

Rehabilitation Act requires that in order to be actionable, the discrimination must have taken

place "*solely* due to an individual's disability." Amie v. Shinseki, 806 F. Supp. 2d 641, 644

(W.D.N.Y. 2011) (citing 29 U.S.C. § 794(a)) (emphasis in original); see Carter v. Potter, No 06-

CV-3854 (JG) (LB), 2008 WL 1848639, at *3 (E.D.N.Y. Apr. 23, 2008) (same).

A "qualified individual" can base a Rehabilitation Act disability discrimination claim on

any of "three available theories:  (1) intentional discrimination (disparate treatment); (2)

disparate impact; and (3) failure to make a reasonable accommodation." Lupe v. Shinseki, No.

1:10-CV-198 (MAD/ATB), 2012 WL 3685954, at *7 (N.D.N.Y. Aug. 24, 2012), citing Fulton v.

Goord, 591 F.3d 37, 43 (2d Cir. 2009) (citation omitted); see also Reg'l Econ. Cmty. Action

Program, Inc. v. City of Middletown, 294 F.3d 35, 48 (2d Cir. 2003).  In this case, Cheung has

asserted disability discrimination claims based upon two theories:  intentional discrimination

(disparate treatment), and failure to provide reasonable accommodation.  See Complaint ¶¶ 47-

50.

Courts analyze intentional disability discrimination (disparate treatment) claims under the

same McDonnell-Douglas burden-shifting analysis established for employment discrimination

cases under Title VII.  See Reg'l Econ. Cmty. Action Program, Inc., 294 F.3d at 48; Simon v.

City of New York, No. 12-CV-1596 (CBA), 2012 WL 4863368, at *6 (E.D.N.Y. Oct. 11, 2012).

To show a violation of the Rehabilitation Act through intentional discrimination, a plaintiff must

9

establish that: (1) she is disabled within the meaning of the Act; (2) she was otherwise qualified to perform the essential functions of her job, with or without a reasonable accommodation; (3) she suffered an adverse employment action due *solely* to her disability; and (4) her employer receives federal financial assistance. Carter, 2008 WL 1848639, at *3; see also Heilweil v. Mount Sinai Hosp., 32 F.3d 718, 722 (2d Cir. 1994), cert. denied, 513 U.S. 1147, 115 S. Ct. 1095, 130 L. Ed. 2d 1063 (1995). Failure to establish any of these four elements is fatal to a disability discrimination claim. Sedor v. Frank, 42 F.3d 741, 746 (2d Cir. 1994), cert. denied sub nom. Sedor v. Runyon, 515 U.S. 1123, 115 S. Ct. 2279, 132 L. Ed. 2d 283 (1995).

In order to prevail on her claims of disability-based discrimination, therefore, Cheung must first establish that she is, in fact disabled. The ADA defines "disability," in pertinent part, as "a physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. §§ 12102(1); see also 29 U.S.C. § 705(20)(B) (same under Rehabilitation Act). In order for a plaintiff to be deemed disabled, she must demonstrate that: (1) she has a physical or mental impairment which substantially limits one or more of her major life activities; (2) she has a record of such an impairment; or (3) she is regarded as having such an impairment. 42 U.S.C. § 12102(1). Importantly, "[m]erely having an impairment . . . does not necessarily make one disabled for purposes of the [Rehabilitation Act)." Hart v. New York University Hospital Center, No. 09-CV-5159, 2011 WL 4755368, at *5 (S.D.N.Y. Oct. 7, 2011), aff'd sub nom. Hart v. New York Univ. Hosp. Ctr., 510 F. App'x 22 (2d Cir. 2013) (citations omitted); see 29 C.F.R. § 1630.2(j)(1)(ii) ("not every impairment will constitute a disability within the meaning of this section"). Moreover, under the ADA and the Rehabilitation Act, it is the plaintiff who "bears the burden of demonstrating that [her] disability fits into the . . . definition envisioned by the [Act]." Gentile v. Potter, 509 F. Supp. 2d 221, 235 (E.D.N.Y. 2007). Failure to meet this burden

10

obliterates a prima facie claim. See McDonald v. City of New York, 786 F. Supp. 2d 588, 612 (E.D.N.Y. 2011) (plaintiff failed to meet his burden of establishing that he suffers from a physical impairment which substantially limits a major life activity); Balonze v. Town Fair Tire Centers, Inc., No. 3:02-CV-2247 (WWE), 2005 WL 752198, at *5 (D.Conn. Mar. 31, 2005) (finding that "plaintiff has not carried her prima facie burden of proving that she was disabled under the ADA").

Put bluntly – and about this there is no material fact in dispute – Cheung has failed to meet this burden. It is not that psoriasis cannot constitute a "disability" within the meaning of the Rehabilitation Act, but it does mean, specifically, that the evidence presented as to Cheung's individual case of psoriasis plainly fails to meet the life activity standard. In fact, the greatest blow to the instant claim is Cheung's own deposition testimony, in which she acknowledged that, in spite of her psoriasis, she was able to do the maintenance work in her apartment building, which, again, included, among other activities, shoveling snow, changing light bulbs, cleaning up, maintaining the lawn, raking leaves, sweeping the grounds, and mopping floors. Def. R. 56.1 Stmt. ¶ 22. She also testified that she ably performed chores around the house, such as doing the laundry, washing dishes and cleaning. Id. ¶ 23. She did not wear gloves during these activities, nor was there any indication in the record that these chores were particularly onerous for her. Id. Additionally, she acknowledged that she had never been hospitalized for her condition, and that it had prevented her from walking – the only "major life activity" that she indicates was ever compromised – on only one occasion. Id. ¶¶ 24-25; 42 U.S.C. § 12102(2)(A). Such testimony fails to provide the statutorily-required proof that plaintiff's psoriasis "substantially limits one or more of her major life activities." 42 U.S.C. § 12102(1)(A). Rather, her self-professed ability to function normally, without any meaningful risk or difficulty, devastates her claim to be disabled.

See <u>Jackson v. Nor Loch Manor Healthcare Facility</u>, 297 F. Supp. 2d 633, 636 (W.D.N.Y.2004), <u>aff'd sub nom.</u> 134 F. App'x 477 (2d Cir. 2005) (affirming summary dismissal of an ADA claim where plaintiff "failed to submit any competent evidence that she had a physical impairment that substantially limited a major life activity.")

Nor does the medical evidence submitted by plaintiff corroborate her claim. As previously discussed, Cheung has consistently resisted providing competent medical attestations to her dermatological condition. In point of fact, of the two doctors from whom she provided notes to USPS, neither is a dermatologist. Still more important, neither has provided any statement identifying symptoms or conditions establishing that she is disabled within the meaning of the Rehabilitation Act. For example, Dr. Yoon, who provided occasional <u>ad hoc</u> notes justifying plaintiff's intermittent, short-term absences from work, characterized the symptoms of plaintiff's vaguely-styled "autoimmune disorder" as temporary conditions, such as weakness and fatigue, which could be cured by brief periods of rest followed by a return to regular duty. <u>See</u> Def. R. 56.1 Stmt. ¶¶ 27-36. For his part, Dr. Lodha provided even less support for plaintiff's claim, noting (reluctantly, by plaintiff's own admission) that plaintiff has psoriasis, but providing no further analysis. <u>See id.</u> ¶¶ 263-268. This barren record fails to provide the necessary showing to support plaintiff's claim of disability. <u>See Heilweil</u>, 32 F.3d at 723 (affirming summary judgment where plaintiff submitted "no medical proof substantiat[ing]" disability).[11]

---

[11]    After her placement on AWOL status, for the first time, plaintiff went to see, and provided a note from, a dermatologist. <u>See</u> Def. R. 56.1 Stmt. ¶ 505. Even in these notes – submitted *after* the alleged discrimination had taken place – the dermatologist spoke only about psoriasis generally while failing to discuss plaintiff's condition with any specificity, and communicated Cheung's requests without herself endorsing them. <u>See id.</u> ¶¶ 507-12.

Lacking this evidence, Cheung, instead, mounts the novel argument that the 2008 amendments to the ADA require that any person suffering from psoriasis be treated as ipso facto disabled. See Pl. Br., Dkt. No. 43-1, at 25-30. This is so, argues plaintiff, for two reasons: first, because the amendments broadened the definition of disability under ADA "to the maximum extent permitted by [its] terms," see ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553; see also 42 U.S.C. § 12102(4)(A), and, second, because the amendments broadened "major life activities" to include "major bodily functions," including the immune system, which plaintiff claims is compromised by her psoriasis. See 42 U.S.C. § 12102(2)(B).

This abstract argument splinters at the touch of legal scrutiny. Not only does plaintiff's briefing fail to provide a single case or even legislative cite to support her theory, but it is apparent that, subsequent to the 2008 amendments, courts have refused to adopt the position she advances here. In fact, the clear consensus is that psoriasis is *not* a disability per se, and that functional impairment beyond that condition itself must still be demonstrated after the 2008 amendments. See Turner v. The Saloon, Ltd., 595 F.3d 679, 689 (7th Cir. 2010) (affirming summary judgment where plaintiff had failed to establish that his psoriasis constituted a disability under the ADA); O'Kane v. Lew, No. 10-CV-5325 (PKC), 2013 WL 6096775, at *6 (E.D.N.Y. Nov. 20, 2013) (granting summary judgment where plaintiff failed to demonstrate that his psoriasis constituted a disability under the Rehabilitation Act); Debell v. Maimonides Med. Ctr., No. 09-CV-3491 (SLT) (RER), 2011WL4710818, at *4-5 (E.D.N.Y. Sept. 30, 2011) (granting summary judgment where plaintiff's medical evidence failed to show that his psoriasis constituted "an ADA-cognizable disability"). Cheung's failure to substantiate her functional impairment, therefore, cannot be glossed over, i.e., she has failed to show that she is disabled

13

under the Rehabilitation Act. Summary judgment on her claims of disability-based discrimination is, consequently, appropriate.

In any case, even if plaintiff were, in fact, disabled for ADA or Rehabilitation Act purposes, her repeated failure to notify USPS of her allegedly disabling condition would still warrant summary judgment for defendant. It is well-settled that "[w]ithout knowledge of [a plaintiff's] disability, it is logically impossible" for an employer to discriminate against her "as a result of [that] disability." Pace v. Paris Maint. Co., 107 F. Supp. 2d 251, 262 (S.D.N.Y. 2000), aff'd, 7 F. App'x 94 (2d Cir. 2001) (citing Barnett v. Revere Smelting & Ref. Corp., 67 F. Supp. 2d 378, 392 (S.D.N.Y. 1999) ("At a minimum, for there to be causation, the employer must have knowledge of the disability.") As previously noted, Cheung did not inform USPS of her condition when she was hired, but instead indicated that she did not have "any medical disorder or physical impairment which could interfere in any way with the full performance of duties" for which she had applied. Def. Rule 56.1 Stmt. ¶¶ 14-15. Additionally, for the first 15 years of her employment, Cheung did not advise USPS management of any issues relating to her then-existing psoriasis, id. ¶ 16, and did not do so even when she was first confronted by a supervisor about wearing her gloves while operating an the automated sorting machine, id. ¶ 248. Even after she finally declared her condition, she repeatedly failed to submit corroborative doctor's notes, id. ¶¶ 254-55, 413, and only submitted a note from a dermatologist *after* the events giving rise to this lawsuit had concluded, id. ¶ 505. Given these facts, about which there is no genuine dispute, USPS could hardly be said to have been on notice that plaintiff suffered from a disabling condition, much less an ADA-defined disability, and, therefore, could not be said to have discriminated against her on that basis.

14

Yet, in an attempt to overcome her failure to notify USPS, Cheung clamors that her supervisors were "aware of [her] disability" because she had submitted notes excusing her occasional absences and had requested permission to wear gloves while working. Compl. ¶ 15. She also claims that supervisors were "aware of [her] having a skin condition" because they "observed [her] face to be red and did not see any other parts of [her] skin because [she] covered all of her skin with her clothing . . . [including] gloves." Pl. Br. at 4. This contention is meritless. It is firmly established that neither the ADA nor the Rehabilitation Act requires employers to infer an employee's disability from the kinds of vague observations that Cheung asserts. Matya v. Dexter Corp., No. 97-CV-763C, 2006 WL 931870, at *8 (W.D.N.Y. Apr. 11, 2006), aff'd, 250 F. App'x 408 (2d Cir. 2007) (granting summary judgment where plaintiff had failed to notify employer of disability because "the ADA does not require clairvoyance on the part of the employer.") (citations omitted). In addition, whatever hints Cheung may have dropped, they were plainly outweighed by her prior, explicit statements to USPS that she did not, in fact, have a disability. If she wished to change that account, she could have done so with an appropriate note from a competent doctor – something she repeatedly failed to provide. Thus, even if her purported disability were established, the failure to notify USPS would, on its own, hobble her claim.[12]

_____

[12]      It is also worth noting that, even if plaintiff's claims for disability-based discrimination and failure to accommodate were reviewed purely on the merits, the standards under the Rehabilitation Act would likely pose an insurmountable challenge to her. As explained above, the Rehabilitation Act requires that a plaintiff establish an adverse employment action "*solely* due to an individual's disability." Amie v. Shinseki, 806 F. Supp. 2d 641, 644 (W.D.N.Y. 2011) (citing 29 U.S.C. § 794(a)) (emphasis in original). Given the background facts, including Cheung's own conduct – the 2008 global financial crisis; the official prohibition against the use of cloth or leather gloves while operating the automated sorting machine, and plaintiff's admitted knowledge of this policy at the time of her voluntary bid; plaintiff's refusal to go on light duty, even to train for a manual position; plaintiff's refusal to submit for a fitness for duty examination; plaintiff's failure to submit doctor's notes substantiating her disability – it cannot

15

For these reasons, no genuine issue of material fact exists as to Cheung's failure to establish that she suffered from a statutorily-defined disability and that, if she did, she failed to notify USPS of it. Summary judgment against plaintiff on these grounds is granted.[13]

II.    Race and Gender Discrimination

Scrambling for an alternative to her foundering disability claim, Cheung contends that her mistreatment smacks of race and gender discrimination. Title VII provides, in relevant part, that "[i]t shall be an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-

_____

plausibly be argued that plaintiff's purported disability constitutes the *sole* basis for the adverse employment actions of which she complains. These facts sink plaintiff's Rehabilitation Act claim. See Sedor, 42 F.3d at 746 (affirming dismissal where employer "show[ed] that its decision was motivated at least in part by a factor other than the plaintiff's disability.").

[13]    Having found that Cheung has failed both to establish her disability and that she put USPS on notice of her claimed disability, her claims relating to USPS's alleged failure to accommodate her cannot survive, as USPS could certainly not be said to have failed to accommodate a disability that it did not know existed even if it did exist. See MacEntee v. IBM (Int'l Bus. Machines), 783 F. Supp. 2d 434, 443 (S.D.N.Y. 2011), aff'd sub nom. MacEntee v. IBM, 471 F. App'x 49 (2d Cir. 2012), cert. denied, 133 S. Ct. 985, 184 L. Ed. 2d 774 (U.S. 2013), rehearing denied, 133 S. Ct. 1751, 185 L. Ed. 2d 805 (U.S. 2013) ("It is . . . the employee's responsibility to demonstrate to an employer that she needs an accommodation for reasons related to a medical condition disability."); see also Felix v. New York City Transit Auth., 324 F.3d 102, 107 (2d Cir. 2003) (affirming summary judgment where plaintiff failed to show "a causal connection between the specific condition which impairs a major life activity and the accommodation.") Moreover, to the extent plaintiff's claims relate to USPS's refusal to allow her to wear her gloves while operating the automated sorting machine, those claims must fail. Accommodation does not mean special treatment, and plaintiff was not entitled to, nor was USPS required to grant, a breach of protocol. See Castellano v. City of New York, 946 F. Supp. 249, 255-56 (S.D.N.Y. 1996), aff'd, 142 F.3d 58 (2d Cir. 1998) (citations omitted) ("Defendants' refusal to provide this special treatment to plaintiffs does not violate any of the federal disability statutes and modification of [its policy] is not necessary to avoid disability based discrimination."). This is true notwithstanding whether the glove protocol was related to the safety of operating the automated machinery. See Turner v. Eastconn Reg'l Educ. Serv. Ctr., 588 F. App'x 41, 43 (2d Cir. 2014) (quoting Shannon v. New York City Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003) for the proposition that "[a] reasonable accommodation can never involve the elimination of an essential function of a job.").

2(a). The Supreme Court has fixed a three-part framework for analyzing a Title VII

discrimination claim. See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36

L. Ed. 2d 668 (1973), holding modified by Hazen Paper Co. v. Biggins, 507 U.S. 604, 113 S. Ct.

1701, 123 L. Ed. 2d 338 (1993). First, the plaintiff must make a prima facie showing that

discrimination has occurred. Id. at 802. The burden of production then shifts to the defendant

employer to give a legitimate, nondiscriminatory reason for the adverse employment action. Id.

at 802-03. Finally, the plaintiff must show by competent evidence that the reasons given by the

defendant are merely a pretext for discrimination. Id. at 804; see also Patterson v. Cnty. of

Oneida, N.Y., 375 F.3d 206, 221 (2d Cir. 2004). All of this is leavened, of course, by the fact

that summary judgment on Title VII claims, as with Rehabilitation Act claims, must be granted

with caution, particularly "where intent is genuinely in issue," Chambers v. TRM Copy Centers

Corp., 43 F.3d 29, 40 (2d Cir. 1994) (citations omitted). But, of course, "[t]he ultimate burden of

persuading the trier of fact that the defendant intentionally discriminated against the plaintiff

remains at all times with the plaintiff, and if the plaintiff has failed to show that there is evidence

that would permit a rational factfinder to infer that the employer's proffered rationale is pretext,

summary judgment dismissing the claim is appropriate." Butts v. New York City Dep't Of

Hous. Pres. And Dev., No. 00-CV-6307, 2007 WL 259937, at *8 (S.D.N.Y. Jan. 29, 2007), aff'd

sub nom. Butts v. NYC Dep't of Hous. Pres. & Dev., 307 F. App'x 596 (2d Cir. 2009).

    As applied to the case at hand, at the first step, Cheung must show (1) that she is a

member of a protected class; (2) that she was qualified for employment in the position; (3) that

she suffered an adverse employment action; and, finally, (4) some minimal evidence suggesting

an inference that the employer acted with discriminatory motivation. Littlejohn v. City of New

York, 795 F.3d 297, 307 (2d Cir. 2015). An inference of discriminatory motivation "can arise

from circumstances including . . . the employer's criticism of the plaintiff's performance in ethnically degrading terms; or its invidious comments about others in the employee's protected group; or the more favorable treatment of employees not in the protected group[.]" Id. at 312 (citation omitted). Despite the fact that "[t]he burden of establishing a prima facie case is not onerous, and has been frequently described as minimal," Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir. 1997), the Second Circuit has also noted that a "jury cannot infer discrimination from thin air," Norton v. Sam's Club, 145 F.3d 114, 119 (2d Cir. 1998). Ultimately, a Title VII plaintiff must show more than the mere suffering of an adverse employment consequence by a member of a protected class. If Cheung makes such a prima facie showing, at the second step, the burden will shift to USPS to come forward with its justification for the adverse employment action, which, at the third step, Cheung can try to prove to be a mere pretext to cover up the discrimination. Littlejohn, 795 F.3d at 307-08.

Cheung's claim of racial discrimination fares no better than her claim for disability-based discrimination. Assuming, for argument sake, she has satisfied the first three prongs of the critical test under Littlejohn, Cheung has failed to adduce a speck of evidence showing race- or gender-based discriminatory motivation. Plaintiff does not allege – nor does any record evidence support – discriminatory statements or conduct by any of the decision-makers behind the charged adverse employment actions. See, e.g., Cheung Dep., Dkt. No. 42-1, at 175:11-16. She is left empty-handed, for example, on her search for situations in which similarly situated males and non-Asians purportedly received disparate favorable treatment from her. See Int'l Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n.15, 97 S. Ct. 1843, 1854, 52 L. Ed. 2d 396 (1977).

Grasping at straws, plaintiff settles on the case of a disabled white male employee, William McGarry, who, she says, "[u]pon information and belief . . . was permitted to work on non-machine duties . . . without having to apply for light duty." Compl. ¶ 40. But in order for this comparison to hold water, Cheung must be able to establish that she and McGarry are similar in "all material respects." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000) (inference of disparate treatment requires "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases"). The cases of McGarry and Cheung, however, are miles apart. Most significant, McGarry suffers from conditions that constitute clear disabilities under the ADA and Rehabilitation Act, including cerebral palsy and partial paralysis of his left arm. Def. Rule 56.1 Stmt. ¶ 523. These disabilities, moreover, were made known to USPS at the time of his hiring, id. ¶ 522, unlike Cheung's failure to disclose her claimed disability. These differences, in themselves, explain any difference in treatment and make McGarry unsuitable as a comparator. See Def. Resp. to Requests for Admissions, Dkt. No. 44-1 (noting that there was no need for McGarry to submit "additional medical information" because his "pre-existing, demonstrated disabling conditions and limitations were already known to USPS").

It is also important to note that McGarry is hardly the exception that proves the rule. At every turn, Cheung has failed to identify any instance of disparate treatment that might create an inference of discriminatory motivation. The re-postings of manual positions that plaintiff complains she was not afforded were filled by employees senior to her, which does not violate Title VII. Volberg v. Pataki, 917 F. Supp. 909, 916 (N.D.N.Y. 1996), aff'd, 112 F.3d 507 (2d Cir. 1996). Indeed, one of these positions was filled by an Asian woman, further vitiating her accusation of race- and sex-based discrimination. See Def. R. 56.1 Stmt. ¶ 193. Also, other

employees, including male employees, had received warnings about wearing non-protocol gloves while using the automated sorting machine. See id. ¶¶ 218, 326-28. And, other employees at the Queens facility had been sent for fitness for duty exams, including at least one white male employee. See id. ¶¶ 373-75. Lacking any evidence of discriminatory statements, actions or disparate treatment of similarly situated individuals, Cheung has failed to advance, even minimally, her Title VII claim.[14]

Simply put, Cheung has failed to adduce evidence creating a genuine issue of material fact. With nothing to try, summary judgment on Cheung's race- and sex-based discrimination claim must be, and is, granted. See Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985) (affirming summary judgment where plaintiff had "offer[ed] purely conclusory allegations of discrimination, absent any concrete particulars").

III.    Retaliation

Last, Cheung claims that USPS retaliated against her for her engagement in protected activities, i.e., her filing EEO complaints. Specifically, Cheung claims that USPS retaliated against her by cancelling her manual bid in 2009, refusing to allow her to wear leather gloves while operating the automated sorting machine, forcing her either to go on light duty or submit to a fitness for duty examination, and placing her on AWOL status. Another bolt of whole cloth is needed for this claim to be spun.

---

[14]    Cheung also complains of racist and sexist motivation for the elimination of her bid in 2009. Compl. ¶¶ 25-28. This claim manifestly lacks merit. Yet, assuming that Cheung had made out a prima facie claim, shifting the burden to USPS, she would have to prove that the 2008 financial crisis, which USPS claimed caused the elimination of at least 77 bids in her mail processing center alone, was a mere pretext for the elimination of her bid. She offers no evidence to support such a far-fetched contention. The record evidence is overwhelming that with respect to this claim and Cheung's other discrimination claims, had she survived the prima facie first step of McDonnell Douglas, she would have thoroughly failed at the third, or pretext, step. See Def. R. 56.1 Stmt. ¶¶ 180-81.

Retaliation claims raised under Title VII and the Rehabilitation Act are analyzed under the same general framework. See Lovejoy-Wilson v. NOCO Motor Fuel, Inc., 263 F.3d 208, 223 (2d Cir. 2001). At the doorstep of a retaliation claim, in order to establish a prima facie case, a plaintiff must show that: (1) she was engaged in a protected activity; (2) that the employer was aware of this activity; (3) that the employer took adverse action against her; and (4) there was a causal connection between the protected activity and the adverse employment action. See Quinn v. Green Tree Credit Corp., 159 F.3d 759, 769 (2d Cir. 1998). Once a prima facie case is established, retaliation charges are subject to the same three-tiered burden shifting analysis established in McDonnell Douglas. See Quinn, 159 F.3d at 768.

A causal connection can be demonstrated through direct evidence of retaliatory animus or "indirectly by showing that the protected activity was closely followed in time by the adverse action." Manoharan v. Columbia Univ. Coll. of Physicians and Surgeons, 842 F.2d 590, 593 (2d Cir.1988). "Closely followed in time," however, is a strict standard. In fact, "[t]hree months is on the outer edge of what courts in this circuit recognize as sufficiently proximate to admit of an inference of causation." Yarde v. Good Samaritan Hosp., 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005); see also Clark County School District v. Breeden, 532 U.S. 268, 273-74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001).

Plaintiff's claims all fall short of this standard. Because Cheung had not filed any EEO complaints (or had engaged in any other activity she contends was protected) prior to the elimination of her manual bid in March 2009, she cannot state a claim for retaliation on that basis. What's more, USPS's refusal to allow Cheung to train for a manual bid without going on light duty took place approximately six months after her July 16, 2009 EEO complaint, see Def. R. 56.1 Stmt. ¶¶ 376, 478-79, and her placement on AWOL status in March 2010 occurred even

later. See id. ¶¶ 376, 483. These retaliation charges plainly fall outside the small window within which such claims can arise.[15]

The only alleged retaliatory act that avoids these pitfalls is centered on USPS's request for Cheung to go on light duty or submit for a fitness for duty examination, which occurred only three weeks after her May 30, 2009 EEO complaint. But the request by USPS – which was made in full compliance with the collective bargaining agreement entered by Cheung's union, see Def. R. 56.1 Stmt. ¶¶ 86-100, 346-351 – hardly constitutes an "adverse action." Certainly, it is well-established that such a request constitutes a reasonable effort to accommodate a plaintiff's purported disability. See Carter, 2008 WL 1848639, at *5 ("[L]ight duty assignments may be reasonable accommodations[.]"); King v. Town of Wallkill, 302 F. Supp. 2d 279, 291 (S.D.N.Y. 2004) (citing Kees v. Wallenstein, 973 F. Supp. 1191, 1196 (W.D.Wash. 1997), aff'd, 161 F.3d 1196 (9th Cir.1998)) ("Reassignment of a disabled employee to a vacant light-duty position is well established as a reasonable accommodation under the ADA."). Instructively, Cheung cites no case indicating otherwise. Rather, she identifies an angry email unearthed in discovery that, she contends, proves that the light duty assignment was, in actuality, a retaliatory pretext:

> "Hi Mini . . . I think I may have Annie Cheung retiring soon. She took a bid on automation and as you know, no cotton gloves are to be worn. She gave James Williams the riot act. I told her that since she is in my PL that she is not to wear the cotton gloves. She tried to get "stink." So you know the devil in me came out. Since you wanna play it your way, I'll send you a Fitness for Duty and let the doctor tell me otherwise. You know it has been over four weeks and she has not returned to duty. Notification from her doctor stated that she can wear cotton gloves but that is what she told him.

---

[15]     In addition, Cheung cannot state a claim for retaliation based on her union grievances, as those filings were not protected from retaliation under Title VII or the Rehabilitation Act. See Ebanks v. New York City Dep't of Envtl. Prot., No. 05-CV-3172 (RRM) (LB), 2009 WL 891796, at *7 (E.D.N.Y. Mar. 31, 2009) ("The filing of a union grievance, however, is not a 'protected activity' under Title VII and, therefore, cannot form the basis for a Title VII retaliation claim.").

> The Medical Unit states that she is to wear assigned gloves that the PO provided. Since she has to apply for lite duty and the work here has been somewhat limited, her chances of getting at least 6 hours are slim to none."

See Ford Letter. Dkt. No. 44-7.

This email, which Cheung dubs the "smoking gun" of her case, see Pl. Br. at 71, does not provide the evidence needed for claim survival. Although it may express general hostility toward Cheung, "personal animosity is not tantamount to retaliatory animus." Murphy v. City of Rochester, 986 F. Supp. 2d 257, 275 (W.D.N.Y. 2013). To re-set the table, it is well-settled that Title VII and the Rehabilitation Act prohibit employers from retaliating against employees only where the retaliatory conduct is sparked by the employee's protected activities, and so, a showing of mere general animosity, untethered to a protected activity, fails to state a retaliation claim. See Syfert v. City of Rome, No. 6:15-CV-1149 (LEK/ATB), 2015 WL 6819168, at *9, n.18 (N.D.N.Y. Nov. 5, 2015) (dismissing retaliation claim where "the alleged retaliation is not for the exercise of a constitutional right [but] due to animosity [against] plaintiff."); Ockimey v. Town of Hempstead, No. 05-CV-3872 (ENV-MLO), 2009 WL 1941915, at *11 (E.D.N.Y. July 6, 2009) (where plaintiff "show[ed], at most . . . animosity between the town and a few of its employees, including [plaintiff]" but "fail[ed] to shed any light on the all-important issue – the reason for that animosity", plaintiff "[did] not . . . meet even his de minimis burden on the retaliatory discharge claim."); Shamoon v. Potter, No. 05-CV-4508 (NGLB), 2006 WL 3051771, at *3 (E.D.N.Y. Oct. 25, 2006) (citing Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir.2004) (dismissing retaliation claim divorced from protected activities because "Title VII does not establish a general civility code for the American workplace.") The email in no way mentions, or otherwise displays any connection to, Cheung's having filed EEO complaints or any other protected activity. It cannot, therefore, show retaliatory animus, dowsing Cheung's

smoking gun and dooming any hope to make a prima facie claim for retaliation.  On this cause as well, summary judgment is awarded to USPS.

Conclusion

For the reasons set forth above, finding no genuine issue of material fact to be tried, defendant's motion for summary judgment is granted in its entirety.  Plaintiff's cross-motion for partial summary judgment is, correspondingly, denied.

The Clerk of Court is directed to enter judgment accordingly and to close this case.

So Ordered.

Dated: Brooklyn, New York
      June 19, 2016

/s/ USDJ VITALIANO

ERIC N. VITALIANO
United States District Judge